My name is Jason Maracci and I'm appearing on behalf of the petitioner, Bedell Shire. In this case, the petitioner, through his credible testimony, clearly established that he had a well-founded fear of persecution. That well-founded fear of persecution was based upon his minority Mi'kdun clan status, was based upon the murder of his father and his uncle by enemies of his clan, and it was based upon the fact that in Somalia there is no central government and that Somalia is dominated by ethnic and clan-based militias and that he is in a clan that does not have a militia and that does not control any testimony. Let me just ask you this, just sort of jump right to it. In order to grant relief, we would have to find that Mr. Shire presented evidence so compelling that no reasonable fact finder could find that he is ineligible for asylum. What specific compelling evidence would support relief for Mr. Shire under this deferential standard? I think the compelling relief is that he's coming from a country where, as the I.J. put it, there's general chaos and violence and strife, but he's also from a group that is, where the situation is appreciably different than the average Somali citizen, and because of that, there's no protection for him in Somalia. He has no government that can protect him. He has no clan that can protect him. And that's why I think that he really clearly did establish that his fear was objective. Well, I think he was found to be credible, but the objective part of it were, why couldn't he remain in Kenya with his family? There's no evidence that he would have been deported or arrested by that government. Actually, Your Honor, I believe that there was some documents that were submitted in the case, I think by the government, that showed, dealt with the fact that Kenya was beginning to get tired of having all these Somali refugees and was trying to get them out of their country. I don't have the site in front of me, but I can find that. He didn't at his testimony. Don't we have to get back, perhaps, to his application to determine what happened to him? We have the testimony about his relatives being killed. His oral testimony didn't contain anything about himself, but his application was incorporated by reference as an exhibit. So what does that tell us? What's your best evidence as to what happened to him that would constitute personal past persecution, aside from the ill treatment of his relatives? I don't think, Your Honor, that he actually established that he directly was persecuted in the past. I think the standard that he would have to prove is that he had an objective fear of being persecuted in the future, and that the way that he would establish that has to do with what happened to his father and his uncle and also the situation that he faces as a minority clan member in Somalia. I thought he said in his application he had been imprisoned. Is that right? I believe that that was in the written application, or that he had been detained. Detained, yes. But I gather from what you're arguing this morning is you're not claiming past persecution and that I.J. failed to apply the presumption. You're just simply arguing credible evidence of well-founded future persecution. Am I right? Your Honor. Okay. Do you contend that there was a pattern in practice to eliminate the members of the Midgan clan? His clan? Sure. I'm not saying specifically the Midgan. I'm saying minority groups in Somalia in general, and that's what our State Department report said that. . . How about his clan? I don't know. Which is a disfavored clan, correct? Yes, Your Honor. It's a disfavored clan, and I think that. . . It's not well-liked by the other majority clans. No, it's not. It's only 2 percent of the population, and they don't have any militia, and they don't control any territory. And the reason that they're disliked is that they were tied in with the previous regime in Somalia. Right. That was overthrown by the civil war that occurred. I don't think that the State Department report specifically addresses the Midgan. It says, hey, the Midgan are specifically facing this danger. What it does deal with is minority groups in Somalia in general, and it states that minority groups in Somalia are subject to killings and harassment and abuse and intimidation by armed groups of all affiliations, which goes to the issue of whether there would be a safe part of Somalia for him. And according to our State Department report, there's really not. Well, you know, we have case law that says if you're a member of a disfavored group that has suffered maybe not pattern and practice persecution, but has been the victim, you know, has been victimized, that the greater that victimization, the less individual showing that the individual has to make. Yes, Your Honor. I believe that's the Cotes case. Right. And that's really what your argument is here. That's really my argument is really Cotes, in that Cotes looked at the context of a case where you have conditions of civil strife and general violence, and Cotes said in that situation, the controlling question is, does the applicant face a danger, face an appreciable harm that's different than the average citizen in that country? And here, because of the State Department reports, the petitioner clearly does face a danger that's appreciably different than the average Somali citizen. I don't have, you know, if the I.J. had said, oh, granted his petition, I wouldn't have a problem with that. But the I.J. denied it. And so what I really, as an appellate judge, what I struggle with here is I have to find this record so compelling that no reasonable fact finder could find Shire was not eligible for asylum. And what there's a lot of cases as an appellate judge that you look at that you say, okay, I might have done it differently if it were a de novo standard. I don't know. But I would, I think the court, either way, there are ways they could go either way. And I'm trying to say, why isn't this one of those cases? Because compelling, you know, there's a deferential standard there. I think that here, Your Honor, the I.J. didn't really explain the rationale for denying asylum other than to say, oh, Somalia has a lot of problems. That's why he left. There was not any evidence in the record. There's no testimony where the petitioner says, oh, well, it was bad for everybody in Somalia. That's why I left. Rather, the petitioner testified quite clearly that the reason he fled Somalia was because of what had happened to his father and his uncle and because of his situation for his clan, that it was a disfavored clan and that it was not safe for him anywhere in Somalia. Well, apparently, though, in the record, he wasn't really able to, he couldn't provide any reason why he believed that his father and uncle were killed by a rival clan other than the fact that the clan was known to be violent and powerful, and apparently that somehow was, you know, weighed on the I.J. in a different way than you're asking this Court to. I think, Your Honor, what he testified was that the reason he believed that they were the ones responsible for the murder is that because those were the groups that were controlling the area where they were killed, and so it was a very reasonable assumption that they were the ones responsible for the murder of his father and his uncle. But he was not directly there when any of those incidents happened. That's correct. Do you want to save some time for rebuttal? Thank you, Your Honor. Okay. Good morning, please, the Court. My name is Jennifer Lightbody, and I represent the respondent. The record evidence in this case does not compel the conclusion that Petitioner Shire has a well-founded fear of future persecution in Somalia. Accordingly, the Court should affirm the Board's decision and dismiss the petition for review. In his brief to this Court, the Petitioner cited as compelling evidence, page 126 of the record, to support his assertion that there is a well-founded fear. And in that portion of the record, it talks about killings, harassment and intimidation and abuse of certain minority clans. And there are 11 clans that are listed among that group. The clan that is missing is the clan that the Petitioner belongs to. So his record evidence that he points to as compelling evidence doesn't support his position. How do you deal with the we recently decided the case of Alley v. Ashcroft, and did find in that case that the so-called Mijin clan was a clan that suffered great discrimination and perhaps the most discrimination of all the clans in Somalia? Well, the record evidence in this case, which included the 2001, I believe, country reports, does discuss the Mijin clan to which Petitioner belonged. And it's the same clan as the Petitioner in Alley. And at page 109 of the record in this case, it specifically says that the Mijin clan and other clans did not pose a significant threat to any other clan, and that particular individuals and families who have visibly supported the old regime were vulnerable to retaliation. And there's no evidence in this record that the Petitioner in any way supported the prior regime. And I believe in Alley, the Petitioner's husband actually did work for the he was, I believe, the Secretary of Education. He worked for the previous regime. It probably was a little bit different case because they'd resettled in or they tried to resettle in Ethiopia. But the testimony in that case was fairly strong that they were, of all in the refugee, they weren't safe in the refugee camps because this was the most disfavored clan of all those in Somalia among the Somalia clans. So I'm not trying to import the evidence, but then we rejected the government's position that it would change country conditions based on that evidence. And although it was a 96 country report involved in Alley, and here you've got an updated one, I'm not sure they're materially different. Well, the evidence in the 2001 country reports do indicate that they are vulnerable. But, again, it's for those who visibly supported the prior regime. And also at page 109, it does indicate that that clan was targeted during civil strife, which supports the immigration judge's finding that this is civil strife. And I would also point the court to page 139 of the record, which is evidence that the petitioner submitted to the immigration court, which absolutely rebuts his contention. And it says this is asylum in the U.K. It isn't considered the best evidence, but it is certainly evidence in the record. And it says the Migdan who may risk harassment by Somalian clans in rural areas do not necessarily find themselves facing difficulties in Mogadishu now. And this is a 2002 article. It further says that the Migdan have been able to resettle in Puntland. So there isn't compelling evidence in this record that the petitioner faces a well-founded fear. He hasn't shown any evidence that he was specifically targeted. What he relies on is, again, page 126 of the record, which doesn't support his position. And he also says that it's based on the killings of his father and uncle. And while the immigration judge did find the petitioner credible, at page 52 of the record, the immigration court says that it does have some doubts regarding petitioner's surmising of the reason for his father's and uncle's death. So he does question the actual statement that petitioner makes with respect to how his father and uncle were killed. It's merely his belief that his father and uncle were killed by this clan. And while he was found credible, and the immigration judge credited that, that that was his belief, it doesn't mean that that is actually the fact that his father and uncle were, in fact, killed by this clan. By analogy, if the petitioner had said that he was the king of England and he honestly believed that, the immigration judge found incredible that he believes that. There's quite a bit of difference, though, wouldn't you agree? I mean, there's no alternative factual theory asserted by the government as to these events, right? If he said he was the king of England, that would be demonstrably untrue. Well, right. And the government didn't argue that it was untrue. They just said, you don't know for sure. We have some doubts. We have some reservations. You are credible, but we don't necessarily, and while we believe that you believe your father and uncle were killed, we don't necessarily believe the ultimate. He's asserting a conclusion that his father and uncle were killed, and he wasn't there at the time. He never claimed somebody told him that his father and uncle were killed by this rival clan. When his father was allegedly killed, he wasn't even present in the country at the time. He didn't have a death certificate. He didn't even go back and try to find out the basis of it. He just assumed it was because that rival clan was in control. And I would submit to the court or refer the court to its decision, its 2001 decision, which is cited in the government's brief of OCHA of 254 Fed 3859, which supports the government's position that there is no evidence. It was his belief, and he stated that that was his belief of how his father and uncle were killed, but it isn't a fact. And I also cited in a 28-J letter to the court, the Eighth Circuit's recent decision in Hassan v. Ashcroft at 388 Fed 3661. Again, in a case similar to this where the petitioner just assumed that his wife was killed because of her refusal to work in a hospital that was run by an opposing clan, and the court, in affirming the immigration judge's finding of no well-founded fear, specifically said that Hassan asks us to accept this assumption, and it's not a fact. And again, like in this case, it is an assumption and not a fact. I would submit to this court that as set forth in the government's brief, the record evidence in this case does not compel the conclusion that the petitioner has a well-founded fear. He has told this court today that he is not proceeding on a claim of past persecution in this case. And again, the incidents that he claimed giving rise to a claim of past persecution before the immigration judge simply did not, under the case law of this court, rise to the level of past persecution. He claimed he was harassed by some classmates, and he claimed that his father and uncle were killed. And I know of no board decision where simply the killing of someone's family members would rise to the level of past persecution. It has to be something directed at the applicant, and there's no evidence that any of that was directed at the applicant. The immigration judge's decision, first of all, with respect to doubting about the or having reservations regarding the reasons for the father's and uncle's death, as well as the record evidence in this case, particularly page 109 of the record, 126, and 139 of the record constitute substantial evidence supporting the immigration judge's decision. Furthermore, the petitioner has not set forth any record evidence which would compel a contrary conclusion. What he's asserted here today, essentially, is a claim that his clan is more vulnerable to being harassed or intimidated, and I would submit to this court that he did not raise that issue before the board, and that constitutes a failure to exhaust his administrative remedies. He did not proceed on a claim that he faces or would be subject to well-founded or to future persecution based on his vulnerability due to his clan membership. And for those reasons, I would ask the court to affirm the decision below. Thank you, counsel. Thank you. Actually, in the Board of Immigration appeal brief, it addressed the issue of the petitioner having a greater fear because of his minority status. So you think you've administratively exhausted that? Yes, Your Honor, I think so. What's the reference in the record? I'm sorry? May we have the reference in the record? If you don't have it at hand, that's fine. Sure. It's in the BIA brief. What's the correct pronunciation? Is it Midgen? Midgen, yes, Your Honor. I would hold it here that the judge is required to explain his decision and support it by substantial evidence, and here the judge really doesn't give evidence to rationalize why he's denying the case other than to say there's general conditions of violence and unrest in Somalia, and if we follow that theory and apply that to asylum cases, we would eviscerate the asylum protections that we have in this country. Well, but your argument here to us has to be on the record that we have, that it compels another result, right? I think that there's that argument, Your Honor, but I think that there's also the argument that the IJ's decision is not – there's no support for that, and there's not – looking at the substantial evidence standard, that the IJ's decision doesn't have substantial evidence to support it. And in the situation where the BIA affirms without opinion, we would just look to the IJ's decision, and there's no real rationale for why he would claim that somebody whose father and uncle were killed and who's from a disfavored minority clan, why that person would not have an objective fear of returning to his country. You know, I think what you have to show here is that this clan – and we'll just have to evaluate on the record – is so disfavored, because we've held in other cases – I think the Guatemala case has come to mind, where you have indigenous populations that get caught in the crossfire between guerrillas and the militia, abused by both sides, but in fact, civil unrest doesn't give rise to an asylum claim. But here, your claim, as I understand it, is different. This particular clan is so disfavored that there's a pattern of practice in the country. Yes, Your Honor. And that's what we have to evaluate on the basis of the record in light of the appropriate standard of review. Isn't that where we are? Yes, Your Honor. Good. Thank you very much. The case is here to be submitted. Thanks to both of you. We'll proceed to the next case on the oral argument calendar, which is Bosley v. Special Good morning, Your Honors. Good morning. May it please the Court, my name is Sharon Lappin.
judges: Thomas, Paez, Callahan